UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

ANDREW SALONEN *et al.*,

Plaintiffs,

v.                                                          CAUSE NO. 3:23cv861 DRL

FOREST RIVER, INC.,

Defendant.

<u>OPINION AND ORDER</u>

Andrew and Sara Salonen bought a Forest River recreational vehicle they say sustained water and mold damage from a defective and leaking water heater. After unsuccessful repair, they sued Forest River, Inc. for breach of express and implied warranties under state law and violations of the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. §§ 2301 *et seq.*, and the Ohio Consumer Sales Practices Act (OCSPA), Ohio Rev. Code §§ 1345.01 *et seq.* Forest River now requests summary judgment on all claims. In response, the Salonens asserted new legal theories under the Indiana Uniform Commercial Code (UCC), the Indiana Deceptive Consumer Sales Act (IDCSA), Ind. Code §§ 24-5-0.5-1 *et seq.*, the Indiana Product Liability Act (IPLA), Ind. Code. §§ 34-20-1-1 *et seq.*, and the Ohio Product Liability Act (OPLA), Ohio Rev. Code §§ 2307.71 *et seq.* These new theories don't save the suit. The court grants summary judgment.

BACKGROUND

The following facts are established by the summary judgment record, as viewed in the light most favorable to the plaintiffs. *See Lauth v. Covance, Inc.*, 863 F.3d 708, 710 (7th Cir. 2017). On July 2, 2022, Andrew and Sara Salonen purchased a 2022 Forest River Forester recreational vehicle from Camping World in Akron, Ohio [45-2 ¶ 2]. They bought it as a family gift after Mr.

Salonen retired from 20 years of military service as a chief engineer in the United States Navy; they were excited to travel the country that summer with their children [41-2 Interrog. 3; 45-2 ¶ 10]. The Forester came with a one-year, 12,000-mile limited warranty from Forest River [41-3 Ex. A], which became effective on the date of purchase [41-3 ¶ 7]. At the time of purchase, the Salonens received a packet containing the Forest River warranty and the manual for the Forester's water heater, which was separately warranted by its manufacturer, Dometic [41-1 Tr. 19, 65-66; 41-3 ¶ 11; 45-10]. Mr. Salonen signed paperwork indicating he had the opportunity to review the Forest River warranty [41-3 Ex. B].

On July 22, 2022, after Camping World applied optional paint protection, the Salonens picked up the Forester and participated in a walk-through [41-1 Tr. 14-15]. They didn't identify any issues or ask to test its water system [*id.* Tr. 16-17]. Things took a turn around the following week when they went on a camping trip with the vehicle and soon identified unexplained water pooling on the cabin floor, among other issues [*id.* Tr. 20-21; 41-2 Interrog. 3, 5].[1] On August 4, they returned the Forester to Camping World for repairs [41-2 Interrog. 3]. On September 12, Camping World informed the Salonens that the repairs were complete, so they picked up the vehicle four days later [*id.*].

In late October 2022, Mr. Salonen winterized the Forester according to the manufacturer's procedures (his family had no plans to use it for the remainder of the year), and it remained winterized and covered through May 2023 [41-1 Tr. 32; 41-2 Interrog. 3]. At the end of May, Mr. Salonen dewinterized the Forester and again found water on the floor [41-2 Interrog. 3]. He

---

[1] The other issues included no power to ceiling fans, windows not fully closing, batteries not charging due to a tripped breaker, an inoperable exterior storage lock, and faulty speaker wiring [41-2 Interrog. 3, 5]. None of these other issues forms the basis of the lawsuit.

investigated and identified the source—water was spilling from cracks in the welds of the water heater where the inlet and outlet lines connected [*id.*; 45-1 Tr. 35-36]. There was a pool of water that was about two-inches deep; water damage to cabinets in the kitchen, under the refrigerator, and in the bathroom; and water leaching into the subfloor [41-2 Interrog. 3; 45-1 Tr. 35-36]. Based on the volume and given that fresh water would have had little opportunity to leak in such quantities because he had just charged the system, Mr. Salonen concluded the pool must have been there all winter [45-1 Tr. 35-36]. He noticed mold among the items in the storage area and identified broader mildew and mold issues from the smell [*id.* Tr. 37-38].

On May 30, 2023, Mr. Salonen took the Forester back to Camping World for a second round of repairs and informed the dealer of the water heater leak, water damage, and mold [41-2 Interrog. 3, 5]. Forest River authorized Camping World to perform certain warranty repairs, including replacing the water heater and portions of the cabinets that sustained water damage [41-3 ¶ 16; 41-4 at 18-19 (Ex. A)]. On August 4, Camping World told the Salonens that repairs were finished but that Forest River didn't approve repairs to the subfloor [41-2 Interrog. 3].

Mr. Salonen came to pick up the Forester on August 5 [*id.*]. He couldn't inspect the repairs because there was no water in the tank and all the panels had been screwed closed [*id.*]. He asked for water to be applied to the system so he could confirm the repairs, but Camping World told him they couldn't support his request and that he needed to take the Forester with him [*id.*]. He annotated his inability to inspect the repairs on the paperwork and took the Forester home [*id.*].

Just before, on July 14, while these repairs were ongoing, the Salonens sent a letter through their counsel to Forest River noting defects in the Forester, including the hot water tank, water leaks, and overall usability, though not to the subfloor [41-3 Ex. C]. The letter informed Forest River that the Salonens revoked acceptance of the vehicle, demanded return of funds paid,

3

rescinded the contracts, and sought compensation for damages [*id.*]. On July 26, Forest River responded by email and asked for all work orders and sales documents [45-5]. The Salonens provided documents, though the record does not say exactly what. The court will accept at face value that it must have been the work orders and sales documents, as requested.

On August 10, Forest River responded again by email and said it would decline participation in their demand [*id.*]. The company believed that the dealer had addressed any concerns. Forest River also said the reported concerns that fell under its limited warranty were "minor in nature and would not be considered substantial" [*id.*]. It said, "the only repetitive item . . . was the concern regarding the Dometic water heater," which "does not fall under the Forest River limited warranty, but rather the warranty of another warrantor" [*id.*].

On August 26, Mr. Salonen mailed a letter to Forest River complaining about vehicle defects [41-3 Ex. D]. He explained that water from the leaking water heater damaged the Forester's subfloor and caused mold, and he asked Forest River to contact him in writing to arrange inspection and repair [*id.*]. Forest River responded on September 1, this time saying Mr. Salonen's letter didn't detail the defects of concern and who warranted them, or how to contact him, and that Forest River attempted unsuccessfully to reach him at a phone number in its records [41-3 Ex. E]. The letter expressed the company's desire to resolve Mr. Salonen's complaints cooperatively and asked him to contact it by email or phone [*id.*].

In lieu, the Salonens filed suit and claimed that Forest River violated the MMWA, express and implied warranties, and the OCSPA. The complaint alleged defects in and damages to the vehicle but no other harms, save mental anguish. After suing, Mr. Salonen replied to Forest River in an undated letter specifying two defects—water damage to the subfloor from the water tank leak and the lack of power to a ceiling outlet in the kitchen [41-1 Tr. 59-60; 45-9]. The Salonens

4

proffer that he sent this letter on September 30, 2023 [45 at 6]. Forest River received a request to waive service on October 2, 2023, and it waived service on October 23. On June 30, 2025, Forest River moved for summary judgment on all claims. The motion has been fully briefed.

## STANDARD

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must present the court with evidence on which a reasonable jury could rely to find in his favor. *Weaver v. Speedway, LLC*, 28 F.4th 816, 820 (7th Cir. 2022). The court must construe all facts in the light most favorable to the non-moving party, viewing all reasonable inferences in that party's favor, *Bigger v. Facebook, Inc.*, 947 F.3d 1043, 1051 (7th Cir. 2020), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003); *see also Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 924-25 (7th Cir. 2020).

In performing its review, the court "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Instead, the "court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Id.* The court must grant summary judgment when no such genuine factual issue—a triable issue—exists under the law. *Luster v. Ill. Dep't of Corr.*, 652 F.3d 726, 731 (7th Cir. 2011).

## DISCUSSION

A. *Constructive Amendment and Rule 16 Violation.*

The Salonens allege three theories (in four counts) against Forest River: express warranty through MMWA and state law (counts 1 and 2), implied warranty of merchantability (count 3),

and an OCSPA claim (count 4) [1 ¶ 17-42]. Their summary judgment response retains these theories and then purports to add others: implied warranty of fitness for a particular purpose, failure of essential purpose, and violations of the IDCSA, IPLA, and OPLA. Forest River says the Salonens assert these additional grounds for the first time in briefing, and that their argument amounts to constructive amendment of the complaint.

Before reaching this point, the court pauses to note that this augmentation contravenes the court's prior Rule 16 conference and order. The purposes of a pretrial conference include to "expedit[e] disposition of the action" and "discourag[e] wasteful pretrial activities[.]" Fed. R. Civ. P. 16(a); *see also Gorlikowski v. Tolbert*, 52 F.3d 1439, 1443-44 (7th Cir. 1995). In aid of these aims, counsel must be prepared "to make stipulations and admissions about all matters that can reasonably be anticipated for discussion at a pretrial conference," Fed. R. Civ. P. 16(c)(1), including "formulating and simplifying the issues" and "facilitating in other ways the just, speedy, and inexpensive disposition of the action," Fed. R. Civ. P. 16(c)(2)(A), (P).

Decisions at pretrial conferences are memorialized in a pretrial order, which "controls the course of the action unless the court modifies it." Fed. R. Civ. P. 16(d); *see also Erff v. MarkHon Indus, Inc.*, 781 F.2d 613, 617 (7th Cir. 1986) ("the parties rely on the pre-trial conference to inform them precisely what is in controversy"). A litigant's failure to obey the order can result in sanctions. Fed. R. Civ. P. 16(f). Such sanctions may include "prohibiting the disobedient party from supporting or opposing designated claims or defenses," Fed. R. Civ. P. 37(b)(2)(A)(ii), and must impose on the party, its attorney, or both "the reasonable expenses—including attorney's fees—incurred because of any noncompliance" that isn't "substantially justified," unless such an award would be "unjust," Fed. R. Civ. P. 16(f)(2).

The court customarily engages parties about their summary judgment arguments at its Rule 16 conference to streamline this procedure and to smartly schedule briefing and a prompt trial date that affords a reasonable time to rule before the parties engage heavily in final pretrial work. This is for their benefit and for the benefit of their counsel. The court also customarily sets a separate briefing schedule on choice of law, not least in these recreational vehicle cases, and often on a faster track, to streamline summary judgment practice where that will be complex or significantly debated. Complicating or evading these efforts only increases a lawyer's burden, the client's expense, and the court's time to rule.

At a status conference held on June 9, 2025, the court engaged the parties about which claims the Salonens would pursue from there. They agreed they had no express warranty claim and no one needed to address that claim on summary judgment. They also agreed that their implied warranty claim relied on a merchantability theory, not fitness for a particular purpose. They preserved a deceptive practices claim, albeit specifying that under the OCSPA. The court afforded the parties a chance to confer about whether the case would resolve or whether a summary judgment motion on the two retained claims was even necessary, not to add things back into the case. At the hearing, the court summarized the agreements reached—"all that we need to discuss at any summary judgment, are only two things: One is an implied warranty of merchantability claim and, of course, [through] the vehicle of Magnuson-Moss . . . and then, two, the Ohio Consumers Sales Practices Act," which is really a reflection of that implied warranty claim[.]" The Salonens never corrected this record.

The court memorialized the status conference in a written order, noting the "parties agreed that the only remaining claims—and the only unabandoned claims to be addressed in a dispositive motion—include the implied warranty of merchantability (including under the

7

Magnuson-Moss Warranty Act) and a violation of the Ohio Consumer Sales Practices Act" [35]. At no time did the Salonens seek relief from this order. At no time, either during the conference designed to streamline summary judgment work or in any motion, did they seek to add even more claims or theories. Their later notice, wherein they said they intended to proceed with "all of their claims," was of no moment. Nor did it have the effect of invigorating new claims or theories. The summary judgment briefing from the Salonens thus is nothing short of disregard of the court's orders under Rule 16, both at the hearing and on June 13, 2025.

In fairness, the Salonens received another warranty—the Dometic warranty—the same day as the conference. All this means is that they had all the information they needed to address the court's orders related to the scope of summary judgment briefing, but they did not have the unilateral right to pivot. That Dometic disclaimed certain liabilities, by way of a written warranty, has nothing to do with whether Forest River violated the IPLA or OPLA. It has nothing to do with whether Forest River could be held liable under an implied warranty because the company knew a particular use of the unit but the vehicle was not so suited. Nor does the fact that Dometic extended a warranty or disclaimed certain responsibilities bear on the separate claim against Forest River because its (not Dometic's) remedy failed of its essential purpose.

That said, for reasons soon discussed, the court believes it fair to the Salonens to reopen consideration of the express warranty claim and both implied warranty theories, as well as to consider the deceptive practices claim, albeit under Indiana law rather than Ohio law, but as a proportional sanction no more than that. This gives the Salonens as fair a shake as this record permits, perhaps more than their fair share, but Forest River has responded in kind. The court cautions counsel nonetheless that future maneuvers that evade the court's Rule 16 orders could result in more severe sanctions than this. Forest River has not asked for fees.

From here, and merely for context for the arguments to come, the court has the discretion to resolve the issue of constructive amendment at summary judgment. Whereas an entirely new claim will be rarely impermissible, merely a new legal theory that rests on the same factual allegations in the complaint might well be permissible. *See Schmees v. HC1.COM, Inc.*, 77 F.4th 483, 489-90 (7th Cir. 2023). A defendant is entitled to fair notice of each claim against it. *See id.* at 488; *Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012). And when the court elects to weigh this as a proposed amendment, it applies "the familiar standards governing when leave to amend should be granted, paying particular attention to the potential for prejudice to other parties." *Schmees*, 77 F.4th at 490. The court does so today cognizant of the difference between claims and legal theories. *See, e.g.*, *Signal Funding, LLC v. Sugar Felsenthal Grais & Helsinger LLP*, 136 F.4th 718, 724 (7th Cir. 2025).

B.  *Applicable Law.*

The briefing cites both Indiana and Ohio law, so the court next addresses choice of law. Generally, a court sitting in diversity applies the choice-of-law rules of the state in which it sits. *Auto-Owners Ins. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). The court also has federal question jurisdiction over this case—via the MMWA—under which "the choice-of-law rule for pendent state claims should be that of the forum." *Balt. Orioles, Inc. v. Major League Baseball Players Ass'n*, 805 F.2d 663, 681 (7th Cir. 1986). The court thus chooses applicable law through Indiana's guidance.

Before engaging in a deeper choice of law analysis, there must be a conflict between state laws "important enough to affect the outcome of the litigation." *Simon v. United States*, 805 N.E.2d 798, 805 (Ind. 2004) (citation omitted); *Rexroad v. Greenwood Motor Lines, Inc.*, 36 N.E.3d 1181, 1183 (Ind. Ct. App. 2015). A "potential conflict" between the laws of two candidate states

suffices. *See Stonington Ins. v. Williams*, 922 N.E.2d 660, 665 (Ind. Ct. App. 2010). Indiana doesn't employ *dépeçage*—analyzing separate issues within claims to assign state law for each issue, *see Simon*, 805 N.E.2d at 805—but treats each claim separately for purposes of choosing applicable law, *see, e.g., Ky. Nat'l Ins. v. Empire Fire & Marine Ins.*, 919 N.E.2d 565, 575-76 (Ind. Ct. App. 2010) ("an Indiana court might analyze a contract claim and a tort claim independently but would not separately analyze and apply the law of different jurisdictions to issues within each claim").

Better preparation for the Rule 16 conference or a more robust conference thereafter between the two sides may have saved some time. The Salonens have a deceptive practices claim. They present that claim today under both the Ohio and Indiana versions of deceptive practices acts—the OCSPA and the IDCSA. But, even now, the Salonens never identify any conflict between these two laws that affects the case's outcome.[2] Instead, they suggest Indiana "prohibits similar deceptive acts" to Ohio. If so, there was no need to debate or brief choice of law because Indiana law then plainly applies. When no conflict of laws exists or a party fails to identify one worthy of analysis, the court applies the law of the forum state, *see Tricor Auto. Grp. v. Dealer VSC Ltd.*, 219 N.E.3d 206, 216 n.7 (Ind. Ct. App. 2023), without making arguments for the parties, *see Clark v. Sweeney*, 607 U.S. 7, 9 (2025) (party presentation rule). The Salonens should have acknowledged that their deceptive practices claim was governed by Indiana law.

Even so, the parties also chose Indiana law through Forest River's warranty, which covers both contract and related tort claims.[3] It uses the broadest of language, worthy of an expansive

---

[2] The Salonens likewise present no conflict between the IPLA or OPLA to require a choice-of-law analysis on any product liability claim, even if it had been pleaded and thereafter preserved.

[3] Under the written warranty, Indiana law governs "all claims or causes of action arising out of or relating to this limited warranty or implied warranty," whether they sound in "contract, tort, or statute," without giving effect to any conflict of law rule that would cause a different jurisdiction's law to apply [41-3].

reach. *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717 (2018), *United States v. Liestman*, 97 F.4th 1054, 1061 (7th Cir. 2024); *Kiefer Specialty Flooring, Inc. v. Tarkett, Inc.*, 174 F.3d 907, 909-10 (7th Cir. 1999). The Salonens posit a deceptive practices claim based on failures to honor the written or implied warranty, so it necessarily relates to the written warranty. Indiana presumes the validity of their contractual choice of law, *see Allen v. Great Am. Rsrv. Ins.*, 766 N.E.2d 1157, 1162 (Ind. 2002), and no exceptional circumstances exist to upset it, *see Barrow v. ATCO Mfg. Co.*, 524 N.E.2d 1313, 1314-15 (Ind. Ct. App. 1988) (citing Restatement (Second) of Conflict of Laws § 187 (Am. Law Inst. 1971)). It cannot be said that Indiana has no "substantial relationship" to the contract (when the manufacturer and warrantor from which the Salonens sought performance are here), nor that Indiana law is contrary to a "fundamental policy" of the state with a materially greater interest in the litigation (when the Salonens say Ohio and Indiana prohibit "similar deceptive acts" and provide no reason why Indiana would vindicate their claims differently on this record). *See id.*; *see also Clark*, 607 U.S. at 9. Indiana law applies.

    C.  *Warranty Claims.*

        1.  *Express Warranty Coverage.*

The Salonens abandoned their express warranty claim and then, after receipt of the Dometic warranty, presented it anew at summary judgment. Though they proceeded without the court's allowance, the Dometic warranty fairly affords new argument, and Forest River had the opportunity to address this claim in full. So the court addresses this claim on its merits.

To prevail on an express warranty claim under Indiana law, a plaintiff must prove the existence of a warranty, its breach, causation, and damages. *Mathews v. REV Recreation Grp., Inc.*, 931 F.3d 619, 622 (7th Cir. 2019) (citing *Peltz Const. Co. v. Dunham*, 436 N.E.2d 892, 894 (Ind. Ct. App. 1982)). "[A]ny affirmation of fact or promise made by the seller to the buyer which relates

to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Ind. Code § 26-1-2-313(1)(a). A seller breaches an express warranty when the goods fail to conform to the warranty, *see Martin v. Thor Motor Coach*, 602 F. Supp.3d 1087, 1094-95 (N.D. Ind. 2022), or when a remedy fails its essential purpose, *see* Ind. Code § 26-1-2-719(2); *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021).

Forest River says the Salonens cannot proceed on their express warranty claim because repairs relating to appliances and mold are not covered by its written warranty. The Salonens respond that their claim instead concerns defects in the water heater's installation and vehicle's assembly. The Salonens take no issue with the replacement water heater they received or any of Forest River's completed repairs [41-1 Tr. 43-44, 52].

Forest River's written warranty covers "substantial" defects in "material and workmanship attributable to Forest River's manufacture and assembly" of the unit. It defines substantial defects as "those defects which prevent the RV from performing its intended use for short term recreational camping." The warranty disclaims certain items, including "injury, damage or loss caused by . . . mold, mildew, or fungi" and "[a]ny appliance, component, system or part of the RV that is covered by another limited warranty[,] . . . [including any] water heater."

The warranty clearly excludes mold damage from coverage, and one cannot breach an express warranty by failing to repair something that isn't covered. The water heater issue is more delicate. The water heater had a two-year warranty from Dometic [45-10], made to the first purchaser so long as installed properly and operated within the United States (or Canada). Dometic warranted the water heater to "be free from defects in material and workmanship at the time of sale and under normal use" and "only when installed per [its] installation instructions." It excludes conditions "unrelated to [its] material and workmanship," including "faulty installation."

12

The Salonens never seem to argue that Forest River failed to repair the water heater in their Forester. Instead, they say faulty welds where the water heater's inlet and outlet lines connected to the tank caused water to spill out of the system, causing other unrepaired damage within the unit [45-1 Tr. 35-36]. In other words, they argue that the defect arose from the water heater's defective installation or the Forester's assembly. Faulty welding from installation of an appliance into the Forester would constitute a defect in Forest River's material or workmanship. *See Smith v. Nexus RVs, LLC*, 468 F. Supp.3d 1012, 1021 (N.D. Ind. 2020). If in fact true, and today's record must be taken in a light favorable to the Salonens, it would not be covered by the Dometic warranty due to its installation disclaimer.

Forest River has not explained why the warranty would otherwise exclude coverage for the welding issue or why water damage to the Forester's subfloor would not be "substantial." A reasonable jury could find, to this point, that the written warranty covered such issues, just not any mold damage. The question remains whether the Salonens exhausted their remedies and afforded Forest River a reasonable opportunity to cure any covered subfloor damage.

2.  *Exhaustion and Reasonable Opportunity to Cure (Express and Implied Warranties).*

Forest River asks for summary judgment on all warranty claims—express and implied—because the Salonens failed to exhaust their warranty remedies and failed to comply with their obligations under Indiana law to give Forest River a final opportunity to repair. The Salonens say they provided notice, but that Forest River either could not fix the remaining issue of concern—suspected water damage to the subfloor—or declined action and thereby waived any right to further opportunities to cure.

In addition to their express warranty claim, the Salonens pursue claims for breach of the implied warranty of merchantability and breach of the implied warranty of fitness for a particular

13

purpose. The implied warranty of merchantability requires that the Forester was merchantable as defined by statute, Ind. Code § 26-1-2-314(2); *see Jones v. Abriani*, 350 N.E.2d 635, 645 (Ind. Ct. App. 1976), including that it was fit for the ordinary purposes for which it is used, Ind. Code § 26-1-2-314(2)(c); *Smith*, 468 F. Supp.3d at 1025; *see also Hyundai Motor Am., Inc. v. Goodin*, 822 N.E.2d 947, 951-52 (Ind. 2005) (implied warranty of merchantability is "liberally construed in favor of the buyer"). To succeed on a claim for breach, a plaintiff must show the existence of a warranty, breach, and that the breach was the proximate cause of the loss. *Irmscher Suppliers, Inc. v. Schuler*, 909 N.E.2d 1040, 1048 (Ind. Ct. App. 2009).

The implied warranty of fitness for a particular purpose requires that, "[w]here the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, . . . the goods shall be fit for such purpose." Ind. Code § 26-1-2-315. To recover for a breach, "the buyer must show: '(1) that seller must have had reason to know buyer's particular purpose, (2) that seller must have had reason to believe buyer was relying on seller's skill and judgment, and (3) that buyer in fact had relied on seller's skill and judgment.'" *Gared Holdings, LLC v. Best Bolt Prods., Inc.*, 991 N.E.2d 1005, 1013 (Ind. Ct. App. 2013) (quoting *Paper Mfrs. Co. v. Rescuers, Inc.*, 60 F. Supp.2d 869, 881 (N.D. Ind. 1999)).

"Timely notice of a breach of warranty is a substantive condition precedent to recovery." *McClure Oil Corp. v. Murray Equip., Inc.*, 515 N.E.2d 546, 554 (Ind. Ct. App. 1987). The warrantor must be given a reasonable opportunity to cure, often viewed as a reasonable time or a reasonable number of attempts at necessary repairs. *Zylstra*, 8 F.4th at 603; *Litsinger v. Forest River, Inc.*, 536 F. Supp.3d 334, 364-65 (N.D. Ind. 2021); *see also Kutz v. Jayco, Inc.*, 738 F. Supp.3d 1035, 1041 (N.D. Ind. 2023). "Under Indiana law, two chances is not a reasonable opportunity to cure." *Mathews*,

14

931 F.3d at 622 (citing *Gen. Motors Corp. v. Sheets*, 818 N.E.2d 49, 53 (Ind. Ct. App. 2004)). A "reasonable opportunity to cure, at least in cases where the defects are somewhat minor, and not affecting full use of the vehicle, means at least three chances." *Zylstra*, 8 F.4th at 603. Attempts to repair "have been undertaken if the nonconformity has been subject to repair . . . but continues to exist." *Gen. Motors*, 818 N.E.2d at 53. A failure by the Salonens to give Forest River notice and a reasonable opportunity to cure would foreclose both express and implied warranty claims.

> Forest River's written warranty included a repair remedy:

> Forest River's SOLE OBLIGATION under this Limited Warranty is to repair any covered Substantial Defect discovered within the applicable Limited Warranty Period if not excluded under the terms of this Limited Warranty. If the authorized selling dealer or local independent authorized dealer does not adequately repair the RV, the Owner must provide written NOTICE by contacting Forest River IN WRITING at Post Office Box 3030, Elkhart, Indiana 46515-3030 and advise it of any Substantial Defect(s), including a list of the Substantial Defect(s), and provide Forest River (and not the authorized dealer) an opportunity to repair the RV. Forest River may require the Owner to deliver the RV to another authorized Forest River dealer or its factory facilities. Forest River, at its sole option, may cover the reasonable costs of transporting the RV to its factory. Refusal to allow Forest River an opportunity to repair the RV will void warranty coverage for the identified Substantial Defect(s) [41-3].

The warranty also required a buyer to exhaust "the written notice and repair remedy . . . prior to initiating any action to seek legal or equitable remedies" for breach of warranty [*id.* (capitalization removed)].

On this record, a reasonable jury could say the Salonens first brought the Forester in for repairs on August 4, 2022 [41-2 Interrog. 3]. In 2022, while traveling, they noticed water on the floor from an unknown source. They thought it might be from a roof leak. Nothing on this record shows that they alerted Forest River of this concern, much less in writing, to give the company actual notice. They instead returned the unit to the dealer (Camping World). Of course, in addition to requiring notice to Forest River, the warranty directed them to do so: "you should

contact your independent authorized selling dealer (to the extent possible) or local independent authorized dealer to schedule the repairs" [41-3].

Often a dealer facilitates notice for the consumer to the manufacturer (warrantor), *see Litsinger*, 536 F. Supp.3d at 367, and Camping World apparently pledged to seek Forest River's warranty approval [45-2], but this record falls short of demonstrating that notice about a subfloor issue went to Forest River in August 2022. At most on this record, the only items identified for repair under the warranty this time were a ceiling fan, window issue, and power loss from a tripped breaker. The dealer thought any water was likely from a spilled water bottle. A jury would need to stretch unreasonably—indeed make a rather notable assumption—to say Forest River had notice of a water heater issue when the dealer preemptively dismissed it as a spilled water bottle. *See, e.g.*, *Mathews*, 931 F.3d at 622 (finding it "doubtful" that it should consider repair attempts when no notice was provided to the manufacturer); *Anderson v. Gulf Stream Coach, Inc.*, 662 F.3d 775, 781-82 (7th Cir. 2011) (notice is satisfied when the manufacturer has actual knowledge of the nonconforming good). Even if the law would permit this conjecture, the Salonens fall even shorter of explaining how this gave Forest River notice and a reasonable opportunity to cure a different defect—any damage to the subfloor. That seems not to have been a discussion even with Camping World, much less Forest River, at this time.

And thus the unit entered the winter months. On May 30, 2023, the Salonens identified the water heater as a source of leaking water [41-2 Interrog. 3].[4] The Salonens saw water on the floor and observed that the cabinets in the kitchen, under the refrigerator, and bathroom sustained water damage. Assuming that the water had been present for some time, the Salonens

---

[4] Or June 1, 2023, as the interrogatory response says both dates. This discrepancy has no effect on the outcome. Most records refer to May 30, 2023 [*e.g.*, 45-7], so the court follows suit.

16

believed the subfloor had been compromised too. Camping World replaced the hot water tank and the cabinets and returned the unit to the Salonens on August 4, 2023. No work was otherwise done to the subfloor.

Forest River reports, through an affidavit from Daniel Evans who was responsible for handling warranty issues during the period in question, that the company never received warranty claims or repair requests related to subfloor damage during the warranty period [41-3 ¶ 17]. The Salonens presume that Camping World must have told Forest River [45-2 ¶ 3]. Mr. Salonen said during a deposition that he doesn't know whether Camping World submitted a warranty claim for the subfloor and Forest River never told him directly that it wouldn't replace it [45-1 Tr. 41, 43]. Camping World, through two separate representatives, merely reported that it "was something that would not get accomplished" [*id.* Tr. 41], which he assumed meant that Forest River had authorized necessary repairs, but not to the subfloor [*id.* 57, 74]. The Salonens claim that Forest River "refused" to replace the subfloor [45-2 ¶ 9], but they never spoke to Forest River at this time to know this [45-1 Tr. 43]. The work orders focused on the water heater and cabinetry, but not the subfloor to suggest this was a conversation between Camping World and Forest River [45-7]. All of this alone would not be enough to show actual notice to Forest River of the subfloor, but the Salonens are more explicit in their interrogatory response that Camping World said that work to the subfloor had not been approved by Forest River [41-2 Interrog. 3]. This seems scant, yet even if barely so, given the need to disambiguate all these statements and to take the evidence in the light most favorable to the Salonens, a reasonable jury could find that Forest River had some notice of a subfloor issue if the jury credits the Salonens's recall of one statement from Camping World over everything else.

From here, a jury could find only the beginnings of one other chance for Forest River to address any suspected subfloor damage, though never consummated. The Salonens try to point to even more, but no jury could reasonably agree. For one, the Salonens say they hired counsel who sent a July 14, 2023 demand letter [41-3]. This letter oddly referred to defects in the water heater tank, though they had been fixed. In fairness, the letter overreached by directing Forest River to have no contact with the Salonens and purported to rescind the contract by way of revoking their acceptance. It asked for the procedure by which the Salonens could return the Forester and recoup the contract price. At no time did the Salonens request additional repairs or work under the written warranty. At no time through this letter did the Salonens request repairs to the subfloor, though the letter generally referred to unspecified "water leaks."

This was not a reasonable opportunity to proceed with work under the warranty, but a demand for rescission—to undo the transaction altogether and restore the parties to the *status quo*. If anything, the demand's language—such as returning the vehicle—suggests the Salonens viewed repair as undesirable. Forest River nonetheless responded five days later to request documentation (the same work orders that identify no subfloor issue) and then advised on August 10 that it understood that all items had been fixed (some minor), that the water heater would be covered by another warranty (Dometic), and that the company "decline[d] participation in [their] demand" [45-5]. Declining rescission of the contract could not be reasonably viewed to mean declining repair rights (or waiving notice rights) under the limited warranty.

The Salonens ostensibly pivoted and engaged Forest River one-on-one again. On August 26, 2023, they wrote a letter to Forest River explaining the suspected subfloor and mold issues they worried had resulted from a water heater leak and requesting a response within ten days to arrange inspection and repair [41-3]. For the first time in writing directly to Forest River, the

18

Salonens identified that the water leak came from faulty welds (already repaired). They recalled the damage to the cabinets (already repaired). They reported that "it was certain the subfloor had been compromised" by the extended presence of standing water. They requested repairs. This was not ignored or rebuffed. Forest River responded by trying multiple times to call the Salonens at their registered number, but without response from them [*id.*]. So the company wrote a letter on September 1, expressed its willingness to resolve any concerns, asked for more detail about any lingering defect, and asked the Salonens to provide updated contact information.

The Salonens declined to respond and filed a lawsuit instead. At this point they had not provided additional information to Forest River. At this point they had not presented the unit to Forest River for inspection. At this point they had not cooperated or tried to respond to Forest River's last inquiry through a reasonable exchange. Why is troubling. They just sued. All they needed to do was follow the warranty. They may have felt frustration at this time; they may have assumed more than they should have; but the written warranty and the law required that they afford Forest River a reasonable opportunity to repair the unit, required the Salonens to exhaust their remedy under the warranty, and warned that their refusal to permit this opportunity would "void warranty coverage" for that identified defect [41-3 (warranty)]. A reasonable jury could not say on this record that the Salonens provided Forest River a reasonable opportunity to cure the subfloor issue. *See Zylstra*, 8 F.4th at 603; *Mathews*, 931 F.3d at 622.

The Salonens failed to afford Forest River a reasonable opportunity to address the subfloor issue, much less three times, and the unit could not be said to have been unduly out of service for this. Indeed, according to the Salonens, no one addressed the subfloor issue to count any real time out of service, except perhaps Camping World's likely modest time to inspect. And,

though it would sizably overcount, even the full 66 days out of service to fix the water heater and cabinetry (from May 30, 2023 to August 4, 2023) would not be under the law unreasonable.

Notwithstanding this, the Salonens mention that Forest River waived its right to cure because it refused to act despite notice of the subfloor issue. For one, this argument seems rather undeveloped—so undeveloped that it never even garnered Forest River's attention in reply. *See Schaefer v. Universal Scaffolding & Equip., LLC*, 839 F.3d 599, 607 (7th Cir. 2016) ("Perfunctory and undeveloped arguments are waived, as are arguments unsupported by legal authority."); *Smith v. Ne. Ill. Univ.*, 388 F.3d 559, 569 (7th Cir. 2004) (same). The Salonens never cite the standard for waiver. They never cite any case law supporting this idea of waiver. Indeed, the two cases they cite, *Perry v. Gulf Stream Coach, Inc.*, 814 N.E.2d 634, 643 (Ind. Ct. App. 2004), and *Zylstra v. DRV, LLC*, 8 F.4th 597, 601 (7th Cir. 2021), never even discuss this particular concept of waiver.[5]

For another, the Salonens merely rest on the same repairs by Camping World and the same campaign of letters, but these repairs and letters would not permit a reasonable jury to find that Forest River intentionally relinquished or abandoned a known right. *See Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (2022); *Tate v. Secura Ins.*, 587 N.E.2d 665, 671 (Ind. 1992). A waiving party must clearly inform the obligors (here the Salonens) that they need not perform a contractual duty, and only then can they "assert waiver against an effort by the waiving party to enforce that same duty." *Knopick v. Jayco, Inc.*, 895 F.3d 525, 530 (7th Cir. 2018). "If not properly contained, the doctrine of waiver can seriously damage the security and predictability that the law provides for parties to a written contract. For this reason, courts confronted with contractual waiver arguments must take care to prevent unintentional expansion of the doctrine." *Id.*

---

[5] The court is quite familiar with *Zylstra*, but the Salonens nonetheless provide no help to the court in zeroing in on its discussion by misciting the case as "8 F.4th 576, 581." No such pinpoint exists in the case.

The Salonens refer to their initial visit to Camping World in August 2022, but once more no reasonable jury could say Forest River had notice of any subfloor damage to waive anything then. The Salonens refer to their second visit to Camping World in May 2023, but Camping World never represented that Forest River was waiving any right, nor have the Salonens developed any argument, whether under principles of agency or otherwise, why their interpretation of Camping World's comments could be fairly attributed to Forest River as a waiver. *See Litsinger*, 536 F. Supp.3d at 365-66; *see also Clark*, 607 U.S. at 9.

"As a general rule, a dealer is not an agent for manufacturers of the products it sells." *Carlisle v. Deere & Co.*, 576 F.3d 649, 656 (7th Cir. 2009). Whatever relationship might be found between Forest River and Camping World for the purpose of performing repairs, *see Litsinger*, 536 F. Supp.3d at 365-66; *see also* 15 U.S.C. § 2307, the warranty underscored that the dealer could not waive anything for Forest River. No one other than Forest River could modify the limited warranty; the dealer could not act as Forest River's agent; and Forest River was not bound by any representation made by the dealer [45-4]. No request for warranty service and no performance of repairs could "constitute a waiver of Forest River's rights" either [*id.*]. As undeveloped as this waiver argument is, the Salonens have not explained why a remark by Camping World could be called Forest River's intentional relinquishment of its contractual right.

And come August and September 2023, rather than insist that no work would be done on the subfloor, Forest River endeavored to engage the Salonens to evaluate this very issue. That is not evidence of waiver, but evidence of responding to a request for repair. The Salonens just chose not to pursue it. The Salonens sued instead, though the warranty required that they exhaust their obligation to provide written notice and to pursue their repair remedy before doing so.

To the extent they wondered whether Forest River intended to close out warranty coverage or to waive its rights to notice and repair, or to the extent they worried whether the company would honor its contract, they could have communicated directly with the company or even sought reasonable assurance, then treated the company's disavowal as an anticipatory breach or repudiation. *See* Ind. Code §§ 26-1-2-609 (permitting written demand for adequate assurance of performance), 26-1-2-610 (authorizing breach remedies for repudiation); *see also Martin v. Thor Motor Coach*, 718 F. Supp.3d 907, 918 (N.D. Ind. 2024). Declining to cooperate and suing wasn't the option—not when they had an exclusive remedy to exhaust. *See* Ind. Code § 26-1-2-719(1)(b) (exclusive remedy is not optional); *see also Metro Holdings One, LLC v. Flynn Creek Partner, LLC*, 25 N.E.3d 141, 160 (Ind. Ct. App. 2014); *Ind. Life Endowment Co. v. Carnithan*, 62 Ind. App. 567, 109 N.E. 851, 854 (Ind. Ct. App. 1915).

Taking the facts in the light most favorable to the Salonens, a reasonable jury could say Camping World provided some notice about the subfloor to Forest River one time, and that the Salonens failed to cooperate with Forest River on a second occasion, but nothing more. In short, a reasonable jury could only find that the Salonens took at most half-steps in giving Forest River notice and a reasonable opportunity to repair, and certainly not the opportunity that the law and this written warranty contemplated before suing.[6] The court grants summary judgment on the express and implied warranty claims accordingly.

---

[6] Only after the lawsuit, the Salonens sent an undated letter to Forest River responding to the company's outreach on September 1 and asking to arrange inspection and repair within ten days [45-9]. Even the Salonens called this a follow up to their "original notice," not to multiple prior notices. Mr. Salonen says this letter was sent on September 30, 2023 [41-1 Tr. 61]. The lawsuit was already filed on September 20, 2023, contrary to the warranty's terms. The Salonens pressed on with waiver of service of process immediately thereafter.

D. *Failure of the Warranty Remedy's Essential Purpose.*

The court has written a great deal about the separate UCC-based claim in Indiana that a warranty's remedy failed of its essential purpose and recommends this discussion without repeating it all here. *Martin*, 718 F. Supp.3d at 915-19; *Martin*, 602 F. Supp.3d at 1092-97; *see also Martin v. Thor Motor Coach*, 2024 U.S. Dist. LEXIS 63718, 1-3 (N.D. Ind. Apr. 8, 2024); *Kenworth of Indianapolis, Inc. v. Seventy-Seven Ltd.*, 134 N.E.3d 370, 379 n.3 (Ind. 2019); *Perry*, 814 N.E.2d at 643-44. In review, it proves clear that the Salonens, even if they could be said to have asserted this theory in their operative pleading, abandoned it at the status conference by not preserving it or seeking relief from the court's prior order under Rule 16.

Even so, this claim cannot survive summary judgment. For this UCC-based claim, "a breach occurs when circumstances cause a warranty's exclusive or limited remedy to fail its essential purpose." *Martin*, 718 F. Supp.3d at 915 (quotations omitted); *see Mathews*, 931 F.3d at 622 (citing Ind. Code § 26-1-2-719(2)).

> A warranty's remedy will rarely fail its essential purpose. It does so when it operates to deprive either party of the substantial value of the bargain. An agreed remedy does not fail of its essential purpose because it results in the party that bears the risk suffering the risk. Rather, it fails only when a party is unfairly deprived of the substantial value of its bargain. Pragmatically, warranties often provide multiple exclusive remedies—for instance, repair, replacement, and *pro rata* refund—so even when one cure might fail its essential purpose, others exist to prevent the warranty from being viewed as remedy-less. This is part of its rarity in the law. . . .
>
> Such an exclusive remedy also might fail its essential purpose should the warrantor disavow its contractual obligation or prove unable or unwilling to repair or replace in a reasonable time. In this example, the buyer loses the benefit of its bargain for the goods—its contractual right.
>
> And why is this so? It is because the parties anticipated and bargained for a repair or replacement of the defective part, but an unexpected circumstance arises that prevents both a repair and replacement, and neither party accepted the risk that such circumstance would occur. At that point, the warranty's remedy no longer serves its essential purpose. In analyzing this claim, it thus proves helpful to

23

> identify the purpose underlying the remedial provision and determine whether application of the remedy in the particular circumstances will further that purpose. If it will, the remedy has not failed its essential purpose. If not, then, and only then, is there a failure of essential purpose.

*Martin*, 718 F. Supp.3d at 915-16 (cleaned up); *see also* Ind. Code §§ 26-1-2-719(1)(a), 26-1-2-719 cmt. purp. 1; *Rheem Mfg. Co. v. Phelps Heating & Air Conditioning, Inc.*, 746 N.E.2d 941, 954-55 (Ind. 2001); *Martin Rispens & Son v. Hall Farms, Inc.*, 621 N.E.2d 1078, 1085 (Ind. 1993); *S. Fin. Grp., LLC v. McFarland State Bank*, 763 F.3d 735, 741 (7th Cir. 2014); *Martin*, 602 F. Supp.3d at 1094; White & Summers, Uniform Commercial Code § 13:20 (2020).

The question here is whether Forest River's warranty proved empty in an unexpected circumstance that neither party contemplated such that it operates to deprive either side of the substantial value of their bargain. Not so here, nor could a reasonable jury say so, because the Salonens never pursued their contractual right of repair with Forest River to its reasonable, and contractually required, exhaustion—not even when the company engaged them. *See Zylstra*, 8 F.4th at 601-03. They need not have "wait[ed] indefinitely for the seller to cure," *Anderson*, 662 F.3d at 783, but they cannot refuse to cooperate and then claim that they put Forest River to the choice, after the reasonable notice required by law, either to fix the unit or to disavow its obligation (or prove unwilling or unable to fix it). A cure remained available, and nothing on this record shows that the warranty's remedy would not have served its purpose. "It is precisely what the [Salonens] contracted to receive; they just never exercised their right to it." *Martin*, 718 F. Supp.3d at 918. They cannot sue in contract, through the UCC or MMWA, for something they had. *See id.* (citing cases); *Mathews*, 931 F.3d at 622 ("limited warranty did not fail in its essential purpose because the Mathews did not avail themselves of the contract's back-up remedy"). The

court thus must grant summary judgment for Forest River on this separate UCC-based failure of essential purpose claim, even if it had been preserved.

E. *Magnuson-Moss Warranty Act (MMWA).*

The MMWA serves as a vehicle for state warranty claims, and it rises and falls with them. *See Priebe v. Autobarn, Ltd.*, 240 F.3d 584, 587 (7th Cir. 2001) (MMWA "does not provide an independent basis for liability; it only provides for federal jurisdiction for some state claims"); *see also Anderson*, 662 F.3d at 781 (MMWA operates only "as a gloss on . . . state law breach of warranty claims"). The court grants summary judgment for Forest River on any warranty theory under state and federal law accordingly.

F. *Indiana Deceptive Consumer Sales Act (IDCSA).*

The Salonens retain a deceptive practices claim, albeit now through the lens of the IDCSA. "A supplier may not commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction," whether "before, during, or after the transaction," and including "both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a). A mine-run breach of warranty isn't alone enough to qualify as a deceptive act, for a mere broken promise isn't the same as a false or deceptive representation. *See McKinney v. State*, 693 N.E.2d 65, 73 (Ind. 1998); *see also Zylstra*, 8 F.4th at 610; *Litsinger*, 536 F. Supp.3d at 360.

That said, a supplier may not represent that a product has performance, characteristics, accessories, uses, or benefits it doesn't have if the supplier knows or should reasonably know it doesn't, Ind. Code § 24-5-0.5-3(b)(1), that goods are of a particular standard or quality if the supplier knows or should reasonably know that they aren't, Ind. Code § 24-5-0.5-3(b)(2), or that a transaction involves or does not involve a warranty if the representation is false and the supplier knows or should reasonably know it is, Ind. Code § 24-5-0.5-3(b)(8). A manufacturer's

25

misrepresentation regarding a recreational vehicle's quality can violate the IDCSA when it proves more than "mere puffery." *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 333 (Ind. 2013), *superseded by statute on other grounds*, *State v. TikTok Inc.*, 245 N.E.3d 681, 694-95 (Ind. Ct. App. 2024); *see also* Ind. Code § 24-5-0.5-3(a).

The IDCSA identifies two types of deceptive acts: uncured and incurable. An uncured act exists when no offer to cure has been made to the consumer within 30 days or an offer to cure has been made and accepted but not completed within a reasonable time. Ind. Code. § 24-5-0.5-2(7). An incurable act is one taken as "part of a scheme, artifice, or device with intent to defraud or mislead." Ind. Code § 24-5-0.5-2(8). "[I]ntent on the part of the violator is required under the [IDCSA] for 'incurable' deceptive acts, but is not required for most other 'deceptive acts.'" *McKinney*, 693 N.E.2d at 67. The Salonens don't characterize their claim as one or the other, but presumably they proceed on the basis of an incurable act because they never point to any written notice to Forest River that would comport with the IDCSA. *See* Ind. Code. § 24-5-0.5-5(a).

Forest River argues that the Salonens have not designated any evidence on which a reasonable jury could find a deceptive act. The record reflects this assessment. They received a warranty, so they cannot claim the promise of one was deceptive. The Salonens say in briefing that Forest River advertised the unit as "travel-ready" and "safe," but never cite to any evidence of these representations. They instead refer to their complaint, but one cannot rely on the pleading at summary judgment; they must have evidence. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *Grant v. Trustees of Ind. Univ.*, 870 F.3d 562, 568 (7th Cir. 2017). They have not pointed to evidence that would permit a reasonable jury to find that Forest River acted with an intent to deceive or mislead them either. The Salonens cannot proceed on their IDCSA claim without such

26

evidence. For these reasons, the court must grant summary judgment to Forest River on the deceptive practices claim.

G. *Indiana Product Liability Act (IPLA).*

The Salonens neither pleaded nor preserved a product liability claim. The IPLA governs all tort claims brought by a consumer against a manufacturer or seller for physical harm caused by its product (or damage to property beyond the product), if the product proves to be in a defective condition unreasonably dangerous to them. Ind. Code §§ 34-20-1-1, 34-20-2-1; *see Kennedy v. Guess, Inc.*, 806 N.E.2d 776, 779-80 (Ind. 2004); *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1007-08 (7th Cir. 2020). The IPLA recognizes three theories of liability—a manufacturing flaw, a defective design, or inadequate warnings. *Brewer v. PACCAR, Inc.*, 124 N.E.3d 616, 621 (Ind. 2019); *Campbell Hausfeld/Scott Fetzer Co. v. Johnson*, 109 N.E.3d 953, 956 (Ind. 2018).

By its express terms, and since the 1995 amendments, the IPLA grounds design and warning defect theories in negligence terms, *see* Ind. Code § 34-20-2-2; *Campbell Hausfeld*, 109 N.E.3d at 957, whereas it frames a manufacturing defect theory in strict liability in the true sense—namely, a showing of negligence is not required, *see* Ind. Code § 34-20-2-2; *Kaiser*, 947 F.3d at 1008; *Smith v. Nexus RVs, LLC*, 468 F. Supp.3d 1012, 1021 (N.D. Ind. 2020). The Salonens never allude in their complaint to any design or warning defects, much less cast anything Forest River allegedly did in terms of negligence.

The Salonens speak at most in terms of a manufacturing defect [*e.g.*, 1 ¶ 13]. Parties may plead in the alternative of course, and the IPLA might not subsume warranty claims and thus permit separate tort and contract theories when a defective product causes damage to property other than the product and not just pure economic loss. *See*, *e.g.*, *Fleetwood Enters., Inc. v. Progressive N. Ins.*, 749 N.E.2d 492, 495 (Ind. 2001); *Bayer Corp. v. Leach*, 153 N.E.3d 1168, 1190 (Ind. Ct.

27

App. 2020). The Salonens belatedly propose to reshape their complaint from one that presents commercial claims under the UCC and MMWA, or a deceptive practices claim under the IDCSA, into an independent tort theory of unreasonable dangerousness under the IPLA.

That is by definition prejudicial after discovery has closed, the court has discussed with the parties the precise claims to be presented and decided on summary judgment, and Forest River has filed its summary judgment briefing in reliance. The Salonens also propose to do so while glossing over in pleading plausible adumbration of unreasonable dangerousness. The court has given the Salonens considerable grace already by considering their express warranty theory, both implied warranty theories, and their deceptive practices claim under the IDCSA, despite the court's prior order and despite the added burden to the parties and to the court. This will not extend to a product liability theory.

In any event, the Salonens purchased a fully integrated Forester recreational vehicle—that was the product—so the economic loss doctrine bars recovery in tort under the IPLA because there was not damage to other property. *See Indianapolis-Marion Cnty. Pub. Library v. Charlier Clark & Linard, P.C.*, 929 N.E.2d 722, 736 (Ind. 2010); *Gunkel v. Renovations, Inc.*, 822 N.E.2d 150, 153 (Ind. 2005); *see, e.g.*, *Hoopes v. Gulf Stream Coach, Inc.*, 2014 U.S. Dist. LEXIS 137055, 27 (N.D. Ind. Sep. 29, 2014) (barring negligence claim when damage occurred only to recreational vehicle). And Indiana has rejected an exception for a mere risk to health. *See Indianapolis Library*, 929 N.E.2d at 733-34; *Progressive Ins. v. Gen. Motors Co.*, 749 N.E.2d 484, 491 (Ind. 2001). The court thus treats this claim both as abandoned and as unactionable under the law.

CONCLUSION

For these reasons, the court GRANTS Forest River's summary judgment motion [38] and

DIRECTS entry of judgment for Forest River. This opinion terminates the case.

SO ORDERED.

March 25, 2026                             *s/ Damon R. Leichty*
                                          Judge, United States District Court